UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| FRANCISCO G ZARATE, | § | CIVIL ACTION NO. M-11-210 |
| | § | |
|     Plaintiff/Counter-Defendant, | § | |
| VS. | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
|     Defendant/Counter-Plaintiff/ | § | |
|     Third-Party Plaintiff, | § | |
| VS. | § | |
| | § | |
| JUAN CANTU, *et al.*, | § | |
| | § | |
|     Third-Party Defendants. | § | |
| | § | |
| COMMUNITY ACTION COUNCIL OF | § | CIVIL ACTION NO. M-12-18 |
| SOUTH TEXAS, | § | Consolidated into |
| | § | Civil Action No. M-11-210 |
|     Plaintiff, | § | |
| VS. | § | |
| | § | |
| FRANCISCO ZARATE, *et al.*, | § | |
| | § | |
|     Defendants/Third-Party | § | |
|     Plaintiff/Cross-Plaintiffs, | § | |
| VS. | § | |
| | § | |
| DAVID FLORES, | § | |
| | § | |
|     Third-Party Defendant/Cross- | § | |
|     Defendant, | § | |
| | § | |
| and | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
|     Defendant. | § | |

**ORDER DENYING DEFENDANT ZARATE'S MOTION FOR SUMMARY JUDGMENT AND GRANTING R&G DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.      Factual and Procedural Background

Now before the Court are Defendant Francisco Zarate's Motion for Summary Judgment (Doc. 36) and Defendants Reyna & Garza, PLLC, Guillermo Reyna, CPA, and Noel Garza, CPA's (collectively, "R&G") Motion for Summary Judgment (Doc. 38) on the claims asserted against them by Community Action Council of South Texas ("CAC").[1]   The central issues presented by this consolidated case are who caused CAC's failure to timely pay its quarterly payroll taxes, resulting in Internal Revenue Service ("IRS") penalties and interest, and who may be assessed the amounts owed.   CAC alleges that it is a nonprofit organization formed over 30 years ago for the purpose of providing a variety of services to low-income residents of Starr, Jim Hogg, and Zapata Counties in Texas.   12cv18 at (Doc. 6-2 at ¶ 3).   CAC has since expanded to Duval and Brooks Counties and now concentrates on providing basic health and transportation services to this five-county area.   *Id.*   Zarate is CAC's former Executive Director who resigned on April 14, 2007.   *Id.* at ¶ 4.   Reyna & Garza, an auditing firm, and its partners Guillermo Reyna and Noel Garza, conducted audits for CAC for the 2004, 2005, and 2006 calendar years. *Id.*   According to CAC, beginning on or before 2004, Zarate began a practice of failing to submit full payment of quarterly payroll taxes to the IRS as required by law.   *Id.* at ¶ 5.   Such payments consisted of "FICA" amounts withheld from employees' wages and matching payments from CAC.   *Id.*   The practice continued until November 29, 2006, when CAC's Board of Directors (hereinafter "Board") was informed that CAC owed over $2 million in unpaid taxes.   *Id.* at ¶ 6. As a result, CAC has undergone "drastic changes" consisting of a substantial reduction in staff and the termination of contracts for operating various programs.   *Id.* at ¶ 7.   CAC has

---

[1]   Unless otherwise noted, all citations to the record are to docket entries in Civil Action No. 11cv210, into which Civil Action No. 12cv18 was consolidated.

experienced "great difficulty in keeping its doors open to provide services to the community" and in "get[ting] control of the financial aspects of its operations." *Id.* By the end of 2007, CAC owed more than $3 million in delinquent payroll taxes. *Id.* According to CAC, R&G failed to advise CAC's Board of the unpaid taxes until after November 29, 2006. *Id.* Based on these allegations, CAC seeks damages from Zarate for his negligence and from R&G for their negligence and breach of the "written contract to provide an audit." *Id.* at ¶¶ 9-15.

Zarate initiated Civil Action No. 11cv210 on July 15, 2011, when he filed a complaint against the United States seeking refund and abatement of the IRS assessments against him for "trust fund" penalties owed by CAC for three quarterly tax periods,[2] claiming that the failure to pay was not attributable to him but to CAC's Chief Financial Officer, David Flores. (Doc. 1). The United States counterclaimed against Zarate seeking payment of the balance due,[3] and brought a third-party complaint against current CAC Executive Director Juan Cantu, Doroteo Garza, and Leo Bazan, claiming that these parties are liable for CAC's unpaid taxes for various quarterly tax periods. (Doc. 5).[4] On January 18, 2012, the United States removed Civil Action No. 12cv18 to this Court after Zarate filed a complaint in that action requesting relief identical to that sought in Civil Action No. 11cv210. 12cv18 at (Docs. 1, 1-2 at ¶¶ 50, 57, 64); *see* 28 U.S.C. §§ 1340, 1346(a)(1), 1441(a), 1446. CAC had initially filed Civil Action No. 12cv18 on November 17, 2008 in the 229th Judicial District Court, Starr County, Texas, for the purpose of

---

[2]  Zarate's assessments are for the first and fourth quarters of 2006 and the first quarter of 2007. (Doc. 1 at ¶¶ 6, 13, and 20; *see also* Doc. 5). Zarate seeks a refund of $100.00 and abatement of the assessments totaling $1,273,203.10 plus interest. (Doc. 1 at ¶¶ 11, 18, 25).
[3]  As of September 14, 2011, the date the United States filed its pleading, the total balance due and owing from Zarate was allegedly $1,258,931.35 plus interest. (Doc. 5 at ¶ 6).
[4]  Cantu was assessed taxes due and owing for the third, and fourth quarters of 2007, Doroteo Garza for the first and fourth quarters of 2006, and Bazan for the first, second, and third quarters of 2007. (Doc. 5). As of September 14, 2011, after credits, the balances due and owing were allegedly $418,377.06 plus interest from Cantu, $335,897.02 plus interest from Doroteo Garza, and $625,054.03 plus interest from Bazan. *Id.* On February 16, 2012, the Court entered default against Doroteo Garza and Bazan. (Docs. 29-32).

asserting its negligence claim against Zarate and its negligence and breach of contract claims against R&G arising from the tax assessments at issue.  12cv18 at (Doc. 6-2).  In addition to his complaint against the United States, Zarate brought a third-party complaint against Flores for his negligence in failing to submit full payment of CAC's quarterly payroll taxes to the IRS.  12cv18 at (Doc. 1-2).  R&G have asserted similar crossclaims against Flores.  12cv18 at (Doc. 6-15). The Court consolidated the original and removed actions and denied CAC's request to sever and remand its claims against Zarate and R&G, over which the Court has supplemental jurisdiction. *See* (Docs. 22, 24); 02/17/12 Minute Entry; 28 U.S.C. § 1367(a).  Zarate and R&G now move for summary judgment on those claims.  (Docs. 36, 38).  Upon review of the Motions and responsive briefing, in light of the relevant law, the Court finds that Zarate's Motion must be denied and R&G's Motion granted for the following reasons.

## II.      Summary Judgment Standard of Review

A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit under the governing law, and is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A party moving for summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings and materials in the record, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a), (c).  Once the moving party carries its burden, the burden shifts to the nonmovant to go beyond the pleadings and provide specific facts showing the existence of a genuine issue for trial.  *Celotex*, 477 U.S. at 324; FED. R. CIV. P. 56(c), (e).  In

conducting its review of the summary judgment record, the court "may not make credibility determinations or weigh the evidence" and must resolve doubts and reasonable inferences regarding the facts in favor of the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006).   However, the nonmovant cannot satisfy its burden with "conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence."  *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010); *see also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

### III.   CAC's Negligence Claims

### A.   Pleaded Allegations

On the basis of the factual allegations described above, CAC asserts that the failure to timely pay its payroll taxes and the resulting damages were proximately caused by the negligent conduct of Zarate and R&G in one or more of the following respects:

a.   failing to use the care that a person of ordinary prudence would have used in operating CAC and in timely paying CAC's payroll taxes;

b.   failing to disclose to the Board the decision not to timely pay CAC's payroll taxes;

c.   failing to perform the duties imposed on each Defendant by the position of trust which each held with respect to CAC;

d.   instructing employees not to disclose the decision to not timely pay CAC's payroll taxes; and

e.   failing to properly supervise the work done by their employees with respect to CAC's financial affairs.

12cv18 at (Doc. 6-2 at ¶ 9).   CAC generally alleges that it suffered damages as a result of Defendants' negligence.   *Id.* at ¶ 10.   Further, CAC asserts that Defendants were grossly negligent in failing to disclose the existence of the delinquent payroll taxes.   *Id.* at ¶ 11.

**B.      Overview of Governing Law**

Under Texas law, "'[t]he elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach.'"   *E.g.*, *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540-41 (5th Cir. 2005) (quoting *IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)).   "Whether a legal duty exists is a threshold question of law in a negligence action, and is to be determined based on the facts surrounding the occurrence in question."   *Id.* at 541 (citing *Thapar v. Zezulka*, 994 S.W.2d 635, 637 (Tex. 1999)).   "To establish a breach of duty, a plaintiff must show that a defendant either did something an ordinarily prudent person exercising ordinary care would not have done under the circumstances, or that the defendant failed to do that which an ordinarily prudent person would have done in the exercise of ordinary care."   *Id.* (citing *Caldwell v. Curioni*, 125 S.W.3d 784, 793 (Tex.App.-Dallas 2004, pet. denied)).   "A defendant's negligence will constitute a proximate cause of a plaintiff's injuries when such negligence was the actual cause of the injuries, and the injuries were a foreseeable result of the negligence."   *Id.* (citing *Leitch v. Hornsby*, 935 S.W.2d 114, 118-19 (Tex. 1996)).

**C.      Zarate's Motion for Summary Judgment**

**1.      Appeal to Texas Business Organizations Code §§ 22.235, 3.102, and 3.105**

Zarate first moves for summary judgment on the grounds that as an "officer" of CAC, a nonprofit corporation, his duties are defined by statutory provisions that preclude his liability for actions taken in good faith, with ordinary care, and in a manner reasonably believed to be in the

best interest of CAC, or for actions taken in reliance on CAC's Chief Financial Officer ("CFO")

Flores.  (Doc. 36).  Zarate cites to specific provisions that he claims afford him this protection,

the first of which states as follows:

> (a) An officer is not liable to the corporation or any other person for an action taken or omission made by the officer in the person's capacity as an officer unless the officer's conduct was not exercised:
>
> (1) in good faith;
>
> (2) with ordinary care; and
>
> (3) in a manner the officer reasonably believes to be in the best interest of the corporation.
>
> (b) This section shall not affect the liability of the corporation for an act or omission of the officer.

TEX. BUS. ORGS. CODE § 22.235.  Zarate also cites to two other provisions stating that a

"governing person" or an "officer of a domestic entity":

> may, in good faith and with ordinary care, rely on information, opinions, reports, or statements, including financial statements and other financial data, concerning a domestic entity or another person and prepared or presented by:
>
> (1) [another] officer or employee of the entity;
>
> (2) legal counsel;
>
> (3) a certified public accountant;
>
> (4) an investment banker;
>
> (5) a person who the [governing person or officer] reasonably believes possesses professional expertise in the matter; or
>
> (6) a committee of the governing authority of which the governing person is not a member.
>
> (b) A [governing person or officer] may not in good faith rely on the information described by Subsection (a) if the [governing person or officer] has knowledge of a matter that makes the reliance unwarranted.

TEX. BUS. ORGS. CODE § 3.102; *see also* § 3.105.   As CAC points out in its response, no evidence exists that Zarate served as a CAC "officer" as that term is defined by the statute. (Doc. 43); *see id.* § 22.231.[5]   The bylaws produced by CAC state that "[t]he officers of this Corporation shall be the President, Vice-President, Secretary, and Treasurer.   All officers of the Corporation shall be duly selected members of the Board."   (Doc. 43, Ex. A at Art. VII § 1). Zarate did not hold any of the named officer positions nor was he a member of the Board during the relevant period; rather, he served as CAC's "Executive Director."   *See* (Doc. 36, Ex. C; Doc. 43, Ex. B).   Therefore, he cannot claim "officer" protection under § 22.235.   (Doc. 36, Ex. C). The other provisions to which Zarate cites, §§ 3.102 and 3.105, do not apply specifically to nonprofit corporations such as CAC.[6]   Even assuming that Zarate may claim the protections afforded to a "governing person" or an "officer of a domestic entity,"[7] the Court cannot ignore

---

[5]  Section 22.231 provides:

> (a) The officers of a corporation shall include a president and a secretary and may include one or more vice presidents, a treasurer, and other officers and assistant officers as considered necessary. Any two or more offices, other than the offices of president and secretary, may be held by the same person.

> (b) A properly designated committee may perform the functions of an officer. A single committee may perform the functions of any two or more officers, including the functions of president and secretary.

> (c) The officers of a corporation may be designated by other or additional titles as provided by the certificate of formation or bylaws of the corporation.

TEX. BUS. ORGS. CODE § 22.231.

[6]   A "nonprofit corporation" is defined by the statute as "a corporation governed as a nonprofit corporation under Chapter 22." TEX. BUS. ORGS. CODE § 1.002(59).

[7]  The statute defines these terms as follows:

> (18) "Domestic entity" means an organization formed under or the internal affairs of which are governed by this code….

> (37) "Governing person" means a person serving as part of the governing authority of an entity….

> (61) "Officer" means an individual elected, appointed, or designated as an officer of an entity by the entity's governing authority or under the entity's governing documents.

the qualification in the cited provisions that he "may not in good faith rely on the information described by Subsection (a)," such as "financial statements and other financial data" prepared or presented to him, if he has knowledge of a matter that makes the reliance unwarranted.  *See* TEX. BUS. ORGS. CODE §§ 3.102(b), 3.105(b).  Based on the Court's review of the record, it finds that a genuine fact issue exists regarding whether Zarate reasonably relied on Flores so as to preclude his liability under §§ 3.102 and 3.105.  Zarate's Motion points to evidence that Flores, not Zarate, was responsible for overseeing CAC's financial affairs and payroll matters, preparing the IRS "Form 941" for the payment of quarterly payroll taxes, and communicating with the IRS. (Doc. 36, Ex. B at pp. 28-30, 67; Ex. C; Ex. D at §§ III, IV).  Zarate also cites to Flores's admission that it was reasonable for Zarate to rely on the "941s" that Flores prepared for Zarate's signature before sending them to the IRS.  (Doc. 36, Ex. B at p. 42).  Flores admitted that because CAC operated programs on a reimbursable basis, at times it did not have the cash flow necessary to timely pay its payroll taxes.  *Id.* at pp. 33, 61-63, 65.  He testified that in about 2001, he began a practice of delaying payment of the taxes until CAC received the necessary revenues.  *Id.* at p. 61.  At first, this practice resulted in no significant delinquencies because CAC made the payments soon after they were due.  *Id.*  However, as CAC grew and started to operate more programs on a reimbursable basis—perhaps most significantly, a 24-hour clinic in Zapata County—CAC's cash flow problems worsened and its tax delinquencies increased.  *Id.* at 61-63.  According to Zarate, he did not know of the delinquencies until an IRS agent met with him to discuss the situation on October 12, 2005.  (Doc. 36, Exs. C, G).  In a letter to the IRS dated December 12, 2005, Flores represented that CAC's failure to pay the taxes "was not due to negligence or apathy, but due to a cash flow problem."  (Doc. 36, Ex. E).  Zarate appeals to this

---

TEX. BUS. ORGS. CODE § 1.002.

letter as an admission that Zarate, as "part" of CAC, "was not negligent and did nothing wrong," and claims that his reasonable reliance on Flores exempts him from any liability.  (Doc. 36). However, as CAC points out in its response, Flores testified that he kept Zarate informed about the lack of funds to pay all of CAC's expenses and payroll taxes, and that Zarate instructed Flores to cover payroll and operational expenses first and then to pay the IRS "as we could." (Doc. 43; Doc. 36, Ex. B at pp. 27-28, 72-75, 79).   Flores also stated that he made recommendations to Zarate for reducing CAC's expenses and generating new revenues, and that Zarate brought "only a couple" of these recommendations to the Board.  (Doc. 36, Ex. B at pp. 68-71).   Flores stated that he did not inform the Board of CAC's tax situation because he believed that it was the responsibility of his "boss," Zarate, to do so.  *Id.* at p. 37.  All of the evidence presented indicates that the Board, although apprised of CAC's cash flow problems, was not informed by Zarate, Flores, or anyone else of the outstanding tax liabilities until a meeting on November 29, 2006, after CAC's line of credit was withdrawn due to IRS tax liens on CAC properties on which the bank also had liens.  (Doc. 36, Ex. B at pp. 38, 109-10, 130; Doc. 36, Ex. F at pp. 17-18).   As the withdrawal of the line of credit prohibited CAC from meeting payroll, Zarate was then forced to inform the Board about the situation at hand, including the reasons for the IRS liens.  *See id.*  Thus, even if Zarate did not know about the tax delinquencies until the meeting with the IRS agent on October 12, 2005, evidence exists that he delayed for more than a year in relaying this information to the Board.  According to a document CAC identifies as Zarate's job description, Zarate was responsible for "manag[ing] all the affairs of the corporation under the direction of the Board of Directors," "review[ing] and analyz[ing]…financial…reports and implications," and "keep[ing] the Board informed on the status of operations and proposed major procedural changes."  (Doc. 43, Ex. C at §§ III.A., IV.B.

& F.).  Zarate's failure to inform the Board of CAC's tax liabilities is one of the omissions alleged by CAC to constitute negligence, and Zarate cannot appeal to his reliance on Flores to exempt him from this alleged liability.  For all of these reasons, the Court rejects Zarate's appeal to the cited statutory provisions as a basis for summary judgment.

## 2.      Statute of Limitations

Zarate also moves for summary judgment on the grounds that Plaintiff's negligence action filed on November 17, 2008 is barred by the applicable statute of limitations.  (Doc. 36). In Texas, a plaintiff must bring its negligence cause of action no later than two years after the date the cause of action accrues.  *See* TEX. CIV. PRAC. & REM. CODE § 16.003.  As a general rule, a cause of action accrues "when a wrongful act causes an injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur."  *Childs v. Haussecker*, 974 S.W.2d 31, 36 (Tex. 1998).  However, where "'the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable,'" courts apply a judicially-crafted exception to the general rule of accrual known as the "discovery rule."  *Id.* at 36-37 (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex.1994)).  Under this rule, a cause of action does not accrue until a plaintiff "knows or, through the exercise of reasonable care and diligence, 'should have known of the wrongful act and resulting injury.'"  *Id.* at 37 (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)).  "A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense."  *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). "Thus, the defendant must (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff

discovered, or in the exercise of reasonable diligence should have discovered the nature of its injury." *Id.*[8]

Zarate's supplemental brief first argues that even if the discovery rule applies, the latest date on which CAC discovered, or in the exercise of reasonable diligence should have discovered the relevant injury, was August 8, 2005, when Flores received a "Final Notice of Intent to Levy and Notice of Your Right to a Hearing" from the IRS.  (Doc. 77; Doc. 77, Ex. B). In support of this argument, Zarate points to the Texas Supreme Court's observation that under the discovery rule, an action for professional negligence resulting in IRS liabilities accrues no later than "the receipt of the deficiency notice, when the IRS takes a final, formal position." *Murphy v. Campbell*, 964 S.W.2d 265, 271 (1998).  However, in *Murphy* it was undisputed that the plaintiffs themselves, all shareholders of a defunct corporation, had notice of the IRS deficiency notice.  *See id.* at p. 267.  Although Zarate equates Flores's receipt of the notice with receipt by CAC, he offers no authority to support the position that notice to the corporation's CFO (who, as explained *supra*, did not inform the Board of CAC's tax liabilities) may be attributed to CAC itself.  *See* (Doc. 77).  Zarate's additional arguments for why the discovery rule does *not* apply make a similar, unsupported presumption; he relies on Flores's knowledge of

---

[8]  Although Zarate cites to authority that CAC must affirmatively plead the discovery rule in its petition or amended or supplemental petition, and has therefore waived its ability to use the rule in avoidance of the statute of limitations, more recent Supreme Court authority provides that CAC must plead *or otherwise raise* application of the rule.  (Doc. 77); *compare Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988); *KPMG Peat Marwick*, 988 S.W.2d at 748.  CAC raised the issue of the discovery rule as early as October 13, 2009 in its response to Zarate's summary judgment motion in state court, and in that response argued that its petition alleges facts supporting application of the rule.  (Doc. 8-12).  Additional authority located by this Court provides that "if a plaintiff asserts the discovery rule in response to a summary judgment motion raising the statute of limitations, even though the discovery rule has not been pleaded in the plaintiff's petition, the parties will be deemed to have tried the issue by consent unless the defendant objects to the plaintiff's assertion of the discovery rule."  *Krohn v. Marcus Cable Assocs., L.P.*, 201 S.W.3d 876 (Tex.App.-Waco 2006, pet. denied).  The record contains no objection by Zarate to CAC's appeal to the discovery rule prior to a ruling on the motion in state court.  *See* (Doc. 9-3).  For these reasons, the Court will not grant Zarate's motion for summary judgment on the basis of CAC's failure to affirmatively plead the discovery rule in its petition.

the tax delinquencies and his ensuing communications with the IRS on behalf of CAC as establishing either that the nature of injury was not "inherently undiscoverable" to CAC or that it should have been discovered more than two years before CAC brought suit.   (Doc. 77). However, again, all of the evidence presented indicates that CAC's governing Board had no knowledge of Flores's practice, or the resulting, accumulated penalties and interest that constitute the asserted injury in this case, until informed by Zarate on November 29, 2006. Further, Zarate has pointed to no evidence establishing that the Board could have discovered, through due diligence, the injury in question from any other source.  *See S.V.*, 933 S.W.2d at 7 ("An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence."); *Murphy*, 964 S.W.2d at 270 (indicating that injury resulting from faulty advice from professional with specialized knowledge is inherently undiscoverable "because of the difficulty a lay person has in knowing of the fault in the advice").   The Court disagrees that Flores's cited testimony that the Board could have reviewed financial documents that Flores took to Board meetings makes this showing; absent further evidence of the content of those documents, that they were available for review does not prove that the Board could have discovered the tax delinquencies by reviewing them.  *See* (Doc. 77; Doc. 77, Ex. E at pp. 31-32).  Zarate has not produced evidence that establishes as a matter of law that CAC discovered or in the exercise of reasonable diligence, should have discovered the nature of its injury more than two years before filing suit.  Therefore, the Court will not enter summary judgment on Zarate's affirmative defense.

**3.     Damages**

Citing to the standard of review for determining a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Zarate next claims that CAC cannot state a claim for which relief

can be granted because the requested relief—amounts owed by CAC to the IRS—have not been paid.  (Doc. 36).  In support, Zarate cites to a single case in which the court observed that "[t]he mere establishing of liability…, as by a judgment which [the plaintiff] may never pay, does not entitle him to recover the amount as for damages actually sustained, which is all he is entitled to recover."  *S. Gas. & Gasoline Engine Co. v. Peveto*, 150 S.W.279, 280 (Tex.Civ.App.-Galveston 1912, no writ).  Obviously, Zarate is not liable to CAC for any taxes the corporation owed at the time they were first due, and still owes.[9]   Rather, the penalties and interest resulting from Flores's practice, allegedly sanctioned or allowed by Zarate, of failing to timely pay CAC's quarterly payroll taxes, constitute the asserted damages.  (Doc. 43).  Although Zarate points to Flores's testimony that CAC has not "paid off" its IRS obligations because "[w]e don't have the funds," the Court cannot discern from the evidence whether CAC has paid any of the penalties and interest in question, or the extent to which these assessments have been finalized.  *See* (Doc. 36, Ex. B at p. 80).  Therefore, it will not dismiss CAC's claim on the sole, asserted basis that CAC has not paid its tax liabilities.

**4.      Breach of Duty and Proximate Cause**

Essentially repeating the arguments discussed in his initial appeal to §§ 22.235, 3.102, and 3.105, Zarate also claims that he is entitled to summary judgment because CAC can produce no evidence that Zarate violated any duty to CAC.  (Doc. 36).  Zarate also argues that CAC's damages, if any, were proximately caused by Flores and not Zarate.  *Id.*   For the reasons discussed *supra*, the Court rejects these arguments given evidence that Zarate directed Flores to pay CAC's expenses first and its payroll taxes as funds became available, and that Zarate had knowledge of Flores's practice of failing to timely pay the taxes, and the resulting liabilities, and

---

[9]  Zarate may, however, be liable to the IRS for those amounts.  *See* 26 U.S.C. § 6672(a).

failed to inform the Board.  For all of these reasons, the Court must deny Zarate's Motion for Summary Judgment on CAC's negligence claim against him.

### D.      R&G's Motion for Summary Judgment

R&G move for summary judgment on CAC's negligence claim against them on various grounds, among them the dispositive argument that they breached no duty owed to CAC.  (Doc. 38).[10]  CAC's Original Petition alleges, and the summary judgment evidence establishes, that CAC contracted with R&G to perform audits for the corporation for the 2004, 2005, and 2006 calendar years.  (Doc. 38, Ex. C).  Under Texas law, "[a] contract for professional services gives rise to a duty by the professional to exercise the degree of care, skill, and competence that reasonably competent members of the profession would exercise under similar circumstances." *Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.*, 252 S.W.3d 586, 594 (Tex.App.-Fort Worth 2008, pet. denied); *see also Univ. Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex.App.-San Antonio 1989, no writ) (standard of care applicable to conduct of auditors or public accountants is same as that applied to other professionals engaged in furnishing skilled services for compensation).  The record establishes that on February 17, 2005, the parties entered into a written agreement to "confirm our understanding of the services [R&G] are to provide for [CAC] for the Years ended December 31, 2004, 2005 & 2006."  (Doc. 38, Ex. C).  This "engagement" agreement provides that R&G "will audit the statement(s) of financial position of [CAC] as of Year End, and the related statements of activities, functional expenses, and cash flows for the Year then ended," and will conduct the audit in accordance with various auditing standards, including "the standards of financial audits contained in Government Auditing

---

[10]   As the Court can resolve this argument without relying on R&G's requests for admissions deemed admitted in state court, the Court need not consider CAC's argument that the matters contained in the requests for admissions "are indeed disputed and not conclusively established."  *See* (Docs. 38, 48; Doc. 38, Exs. H, H-1, I, I-1, J, J-1, K, L).

Standards, issued by the Comptroller General of the United States." *Id.* at p. 3 of 7.  In turn, the contract obligates CAC's "management" to "mak[e] all financial records and related information available to [R&G]," to ensure "the accuracy and completeness of that information," and to establish and maintain "adequate records and effective internal controls over financial reporting and compliance, the selection and application of accounting principles, and the safeguarding of assets." *Id.* at p. 4 of 7.  The agreement further states that "[b]ecause an audit is designed to provide reasonable, but not absolute, assurance and because [R&G] will not perform a detailed examination of all transactions, there is a risk that material misstatements or noncompliance may exist and not be detected by [R&G]." *Id.*  For each of the three audits, Zarate on behalf of CAC signed an additional "Management Representation Letter" confirming to R&G that as of August 15, 2005, September 8, 2006, and October 1, 2007, respectively, CAC had made available to R&G "all…[f]inancial records and related data," that there were no "material transactions that [had] not been properly recorded in the accounting records underlying the financial statements…," and that there were no violations or possible violations of laws or regulations "whose effects should be considered for disclosure in the financial statements."  (Doc. 38, Exs. E & F at ¶¶ 2.a., 4, & 9.a.; Ex. G at ¶¶ 2.a., 4, & 14.a.).  The letters for the first two audits also state that there are no liens or encumbrances on any of CAC's assets, whereas the October 1, 2007 letter provides that "there are various liens on assets such as those by the Internal Revenue Service…"  (Doc. 38, Exs. E & F at ¶ 11; Ex. G at ¶ 15).  The dates of the Management Representation Letters comport with Flores's testimony about the timing of CAC's annual audits.  Specifically, Flores stated that CAC had nine months after the year's end to complete the audit, and he agreed that it took time for CAC to "close its books" and put together all of the information to be submitted to the auditors.  (Doc. 36, Ex. B at pp. 97-98).[11]  He also admitted

---

[11]  This portion of Flores's testimony to which R&G cite is not attached to R&G's Motion or the parties'

that the audit required a certain number of "man hours," such that it was not "out of the ordinary" that an audit for a certain calendar year would be completed in the summer or fall of the year following. *Id.* at pp. 98-99.

The alleged bases for R&G's negligence are that they failed to discover CAC's tax liabilities and then notify the Board. (Doc. 48). Through their Motion, R&G contend that CAC through its "management," and more particularly Flores and Zarate, failed to abide by its contractual obligations to disclose financial records and information that would have enabled R&G to make such a discovery and provide notice to the Board. (Doc. 38). Accordingly, R&G request summary judgment on the grounds that they had no duty to discover the information withheld, and that they breached no duty to CAC by relying on what was actually provided. *Id.*

As explained *supra*, Flores admitted in his deposition that he began the practice of delaying payment of CAC's payroll taxes in 2001. Further, a fact question exists as to when Zarate had knowledge of this continuing practice. At the very least, Zarate knew of the organization's tax liabilities as of October 12, 2005, when he admits that an IRS agent informed him of the situation. Also, the record establishes that the Board first received notice of the substantial penalties and interest that had accrued, and the IRS liens on CAC's properties, on November 29, 2006. As R&G completed the audit for a given calendar year in either the summer or fall of the year following, it is therefore undisputed that Flores had notice of CAC's tax deficiencies by the date of the 2004 audit, that Zarate had notice by the date of the 2005 audit, and that the Board had notice before R&G even began the 2006 audit. In fact, by the time R&G completed the 2006 audit in the fall of 2007, CAC had disclosed the existence of the IRS liens and had executed a power of attorney allowing R&G to contact the IRS on CAC's behalf.

responsive briefing, but the Court need not ignore the citations given that the entirety of Flores's deposition transcript is part of the Court's record in this case. *See* (Doc. 49; Doc. 38, Ex. A; Doc. 48-5, Ex. 2).

(Doc. 38, Ex. D at p. 85; Ex. G at ¶ 15).  Accordingly, at the very least, R&G breached no duty to CAC to discover and inform the Board of CAC's payroll tax liabilities during the 2006 audit given that the Board itself already had knowledge of these liabilities and had disclosed them to R&G.

Turning then to the 2004 and 2005 audits, the Court first notes Flores's admission that he was the contact person for all correspondence with the IRS regarding CAC's payroll tax deficiencies, and that he placed this correspondence in a file in his desk and did not provide any of it to R&G.  (Doc. 38, Ex. A at pp. 104-08; *see also* Ex. D at pp. 61-62).  Flores further admitted that he failed to provide R&G with a single document indicating tax liabilities and continuing penalties and interest in 2004 and 2005, other than the general ledger.  (Doc. 38, Ex. A at pp. 115, 143).  Flores agreed that the general ledger contained no line item for tax penalties and interest.  *Id.* at p. 142.  When asked whether "any one of these letters from the IRS showing hundreds of thousands of dollars of penalty and interest…not set out any place in your general ledger might be of interest to somebody looking at [CAC's] general financial picture," Flores responded in the affirmative.  *Id.* at pp. 146-47.  He also acknowledged that certain affirmative representations in the Management Representation Letters, such as the confirmation that there were no violations of law, did not take into account the outstanding tax liabilities.  *Id.* at pp. 146-50.  Current Executive Director Cantu, who was presented for deposition as CAC's corporate representative, also testified to his belief that CAC did not provide R&G with related, accurate, and complete financial information necessary to conduct the 2004 and 2005 audits.  (Doc. 38, Ex. D at pp. 87-88).  Both Flores and Cantu admitted that failing to provide relevant and correct information defeated the purpose of the audits.  (Doc. 38, Ex. A at p. 150; Ex. D at p. 80).  They also admitted that CAC did not notify R&G of CAC's tax delinquencies until sometime in 2007.

(Doc. 48-5, Ex. 2 at p. 154; Doc. 38, Ex. D at p. 85; *see also* Doc. 36, Ex. B at p. 155).   Again, this date is after Flores, Zarate, *and* the Board had notice of the untimely payment of CAC's payroll taxes, the penalties and interest that had accrued, and the IRS liens on CAC's properties.

In light of the above, R&G take the position that they could not have breached any duty to discover and disclose CAC's tax liabilities during the 2004 and 2005 audits because CAC did not provide them with relevant, complete, and accurate financial information within Flores's and/or Zarate's knowledge and possession, and in fact made false representations in the Management Representation Letters that it had disclosed all such information and that there were no violations of law or liens on CAC's assets.   (Doc. 38).   In response, CAC cites to approximately five pages of text selected from a 150-page document that CAC purports to be the U.S. Comptroller General's "Government Auditing Standards" referenced in the February 17, 2005 engagement letter, claiming that these standards define R&G's duties to CAC.  (Doc. 48 at pp. 4-9; Doc. 48-8, Ex. 5).   CAC also points to the following, additional language from the engagement letter:

> An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested.   We will plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from errors, fraudulent financing reporting, misappropriation of assets, or violations of laws or governmental regulations that are attributable to the Organization or to acts by management or employees acting on behalf of the Organization.

(Doc. 38, Ex. C at p. 4 of 7).   CAC contends that R&G failed to perform the duties imposed by the Government Auditing Standards and the cited portion of the engagement letter, but this argument is supported by little more than a recitation of the selected language from these documents and a general assertion that R&G should have known about the large unpaid balances and penalties being assessed.  (Doc. 48).   The Court also agrees with R&G that the engagement

letter's reference to the Government Auditing Standards does not change or expand the specific provisions of the contract between the parties. (Doc. 49); *see Maxus Exploration Co. v. Moran Bros., Inc.*, 773 S.W.2d 358, 363 (Tex.App.-Dallas 1989), *aff'd*, 773 S.W.2d 358 (1991) (specific language of contract will control its general terms); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133-34 (Tex. 1994) (applying principle to insurance policy). CAC offers one exhibit that it contends should have alerted R&G to CAC's tax liabilities during the 2005 audit: a document that it purports to be an "excerpt from payroll file produced by Defendant Auditors" in response to CAC's requests for production and containing CAC's Form 941s for the year 2005. (Doc. 48-1, Ex. A). CAC claims that R&G were in receipt of the Form 941s contained in this exhibit, and that the forms indicate that not all payroll taxes were paid each quarter. (Doc. 48). R&G object to CAC's characterization of this exhibit, claiming that CAC did not issue a single set of requests for production to all of the R&G Defendants and that the exhibit lacks R&G's "bates-label" identification. (Doc. 49). R&G thus argue that the exhibit is not self-authenticating and has not been authenticated by CAC. *Id.*; *see* FED. R. CIV. P. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). R&G also point out that CAC has produced no evidence indicating when the Form 941s contained in the exhibit were provided to R&G. (Doc. 49). Even were the Court to accept the Form 941s as competent summary judgment evidence that R&G were in receipt of the forms at the time of the 2005 audit, it cannot ignore Flores's testimony that those forms "might have been incorrect" because he was "under the impression" that CAC was paying the 2005 payroll taxes when in fact some of the payments were going to the 2004 penalty and interest assessments. (Doc. 36, Ex. B at p. 118). Consistent with this testimony, the Form 941s for the first and second quarters reflect a "zero"

balance, and although the third and fourth quarter forms show a balance due, the latter contains a handwritten notation that "these taxes were paid" and provides a check number and date.  (Doc. 48-1, Ex. A).  The Court finds that the Form 941s do not raise a genuine issue of fact regarding whether R&G had documents in their possession that should have alerted them to the substantial penalties and interest being assessed against CAC.  Nor does the Court accept CAC's alternate argument that R&G could have requested IRS transcripts that would have enabled them to discover CAC's tax liabilities.  (Doc. 48).  R&G were not hired by CAC to provide accounting services on a continuing basis, but rather to conduct the corporation's audits for three separate calendar years.  The scope of R&G's contracted-for work did not give rise to a duty to perform a detailed examination of all transactions to uncover information that the corporation's CFO and then Executive Director had knowledge of and withheld, or to discern that certain of CAC's affirmative representations were in fact false.  Further, R&G committed no breach of duty by reasonably relying on the financial information and representations given them.  Therefore, the Court must enter summary judgment on CAC's negligence claim against R&G.

## IV.   CAC's Breach of Contract Claim

R&G also move for summary judgment on CAC's breach of contract cause of action due to CAC's prior, material breach of its obligations under the engagement agreement.  (Doc. 38).  CAC's pleaded allegations underlying its breach of contract claim are as follows:

> Defendant [R&G] defaulted in performance of the written contract to provide an audit for Plaintiff [CAC] in accordance with generally accepted accounting standards.  Plaintiff paid this Defendant the agreed contract price.  This Defendant failed to disclose to the Board of Directors of Plaintiff corporation the existence of substantial delinquent payroll taxes on a timely basis and permitted the delinquency to rise to a very high level before the information became known to the Board of Directors through other sources. Defendants breached their duty to Plaintiff corporation to provide timely and relevant information on the financial standing of Plaintiff corporation.

12cv18 at (Doc. 6-2 at ¶ 12).  For reasons similar to those articulated with respect to CAC's negligence claim against R&G, the Court accepts R&G's asserted bases for summary judgment on these allegations.  Under Texas law, "'the essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'"  *E.g.*, *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (quoting *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex.App.-Houston [14th Dist.] 2005, pet. denied)).  The Court accepts R&G's characterization of the engagement agreement as obligating them to conduct "spot" audits—that is, audits in which R&G were to "examin[e], on a test basis, evidence supporting the amounts and disclosures in the financial statements."  (Doc. 38). Although, as CAC points out, R&G promised to "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement," the contract further qualified that the audit was "designed to provide reasonable, but not absolute, assurance" and that R&G would "not perform a detailed examination of all transactions"; therefore, a risk existed that "material misstatements or noncompliance may exist and not be detected."  Further, and perhaps most importantly, the contract obligated CAC's "management" to provide R&G with "all financial records and related information," to ensure "the accuracy and completeness of that information," and to establish and maintain "adequate records and effective internal controls over financial reporting and compliance, the selection and application of accounting principles, and the safeguarding of assets."  Again, the record establishes that CAC's management did not provide R&G with IRS correspondence regarding the organization's payroll tax liabilities. Further, CAC has pointed to no financial record or related information given to R&G that should have alerted them that CAC was accruing substantial penalties and interest as a result of the

failure to timely pay its payroll taxes.  CAC has shown only that it may or may not have provided R&G with Form 941s for the four quarters of 2005 that incorrectly indicated either that the balance was "zero" or had been paid.  Finally, at the time of the 2004 and 2005 audits, CAC represented through its Management Representation Letters that it had provided all financial records and relevant data, that there were no material transactions that had not been properly recorded, that there were no violations or possible violations of laws or regulations whose effects should be considered for disclosure, and that there were no liens or encumbrances on any of CAC's assets.  In light of the above, the Court finds that no evidence exists to create a genuine fact issue regarding whether R&G breached any contracted-for obligation in the engagement agreement, including the obligation to provide *reasonable* assurance of CAC's financial standing.  Further, as R&G point out, "[i]t is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."  *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) (citing *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex.1994)).   As Flores and Cantu both admitted, failing to provide relevant and correct information to R&G defeated the purpose of the audits.  The Court finds that by not providing relevant, accurate, and complete information regarding CAC's tax liabilities—information that was within management's possession and knowledge—CAC committed a material breach of the engagement agreement that excused R&G's performance.  For all of these reasons, the Court must grant R&G's request for summary judgment on CAC's breach of contract claim against them.

**V.      Conclusion**

For the foregoing reasons, the Court hereby **ORDERS** that Zarate's Motion for Summary Judgment (Doc. 36) is **DENIED** and the R&G Defendants' Motion for Summary Judgment (Doc. 38) is **GRANTED**.

SO ORDERED this 26th day of September, 2012, at McAllen, Texas.

Randy Crane
United States District Judge